Lulu C. Gilliland et al., appellees, v. H. C. Leiter, defendant-appellant, and P. D. Verstegen et al., intervenors-appellants.

No. 47829.

(Reported in 47 N.W.2d 142)

April 4, 1951.

498

Shull & Marshall, of Sioux City, for appellants.

George R. Call and Stewart & Hatfield, all of Sioux City, for appellees.

BLISS, J.—We set out herein a tracing of a part of the plat of "The Heights", recorded in April 1914, with the hope that it will simplify and clarify the statement of the facts. The witnesses on each side, being, with few exceptions, residents of the addition, are in agreement on one proposition, and that is that "The Heights" is the very best residential district in Sioux City. Originally it consisted of sixty-one plots, not uniform in size or shape. Most of the plots were quite large. The lengths of some were over 300 feet and the widths of others were over 200 feet. Curving streets divide the addition into irregular parts, of which the central one is somewhat elliptic in form. East Solway Street curves about the east side of this ellipse and West Solway about its west side, and West 24th Street curves about its lower west side and around its base and on east into McDonald Street, which extends north and south as the east boundary of the addition. Quite a number of the plots have been divided, and plots 3, 4, 5 and 6 have been replatted. The uniform width of the streets as laid out is fifty feet except as they widen in opening into other streets.

John McHugh, a trustee, executed the deeds to all of the plots, as grantor. The general provisions of all of the deeds were the same. One provision is that prior to the dissolution of The Heights Association no grantee in a deed could sell the property without the consent of the board of directors of the association.

Another provision in all of the deeds is as follows: "And no buildings, other than single private residences and the out-buildings belonging thereto, and no permanent residence worth less than * * *. $5000 shall be constructed on the premises hereby conveyed, and no buildings shall be located forward of the building line as indicated on the recorded plat of said addition. A violation of any of these provisions may be enjoined by the owner of any plot in said addition." As shown by the recorded plat of the addition, the line of the street and the line of a lot abutting on the street coincide. The building line referred to in the deeds is indicated on the recorded plat by the dotted line forty feet within and from the said street lot line.

On June 22, 1917, McHugh, as trustee, executed a deed conveying plots 20 and 21 to Jeannette L. Gaynor. It was filed for record May 15, 1920. Later Charles S. Van Eaton became the owner of the two plots, and on July 30, 1946, he and his wife executed a deed conveying to Herbert C. Leiter, defendant, all of plot 21 except the north 132⅓ feet thereof. The deed provided that the premises were conveyed "subject to restrictions, reservations and covenants now of record." On December 12, 1946, the engineering firm of Finley & Rath, at the request of Mr. Leiter, made a contour map of the latter's lot for the use of architect Swanson in preparing plans for a residence thereon. These plans were prepared on June 16, 1947. Mr. Swanson and Mr. McEntaffer, the contractor, staked out the house on the grounds. Defendant testified that Mr. Swanson did not inform him about any building-line restrictions but told him that he discussed the plans with the building inspector who informed him that it would be all right to locate the house as planned. The bids for the construction of the house under these plans exceeded the amount that defendant wished to expend, and the Swanson plans were not used.

Later defendant and Mr. McEntaffer prepared plans from drawings obtained from an architectural firm in Detroit, and

about the last of February 1950 defendant directed Mr. Mc-Entaffer to proceed with the construction. Defendant testified that the location staked out for the Swanson plans coincided roughly with the location of his present improvement. He testified that Mr. McEntaffer did not mention the forty-foot building line or the twenty-five-foot zoning line but told him that he had discussed the plans and improvement with the city building inspector who informed him that it was all right. Defendant testified that work was commenced during the second half of March 1950 and that about every other day he was on the ground and observed the work of excavation, pouring the footings, and constructing the tile foundations. Application for the building permit signed by Mr. McEntaffer bears date of March 27, 1950, and the permit issued bears the same date.

It appears from the testimony of plaintiffs' witness K. B. White that he was the city building inspector and had been for eleven years, and prior thereto he had been the inspector's assistant, and that he was a graduate of the University of Illinois, a civil and structural engineer, a licensed surveyor of Iowa and formerly of Illinois, and had architectural and building experience in the construction of several hundred thousand dollars worth of buildings and homes, and had had charge of over $10,000,-000 worth of work over the United States. He identified the building permit which he had issued, and the application therefor, which shows a building 45 feet by 26 feet 6 inches, with projections approximately 15 by 5 feet and 18 by 11 feet, with a second story 52 feet long, 16 feet average width, and 7 feet 6 inches in height. His office estimated the cost of the building, concerning which he testified: "We run it off according to law which says for half of the valuation thereof, $16,000." He testified that the first floor extended clear to the westerly side of the house over the garage in the basement; that he was the enforcing officer of the Zoning Ordinances and the Building Code, and it was his duty to see that the rules of both, or their modification, are complied with—"something that is practical and feasible"; architect Swanson consulted him when he drew the 1946 plans about where he could put the house, and he told him the requirements with regard to "lots facing west on East Solway, and that he would have to observe the line to the north of the other

buildings"; later Mr. Swanson told him he was revising the plans for a less expensive house, and they reviewed the revised plans, and he informed Mr. Swanson that the requirements would be the same; next Mr. McEntaffer, who he stated was a "very satisfactory and dependable contractor", contacted him and asked him to place the house on the lot for him, and he told the contractor to line up the house with the houses to the north and to have an areaway of twenty-five feet or more; "I saw the plans which he had for the house", and the house from north to south would be 36 feet 6 inches.

Mr. White testified that he first received complaint about defendant's house about five or six weeks after the building permit was issued from Earl Gilliland by telephone, speaking of a large mountain of dirt that obstructed his view and that he could not see down the street, and as he drove by it looked as though the house did not line up with the other houses to the north:

"I went out there within an hour and inspected the premises. I looked to see if the zoning requirements as given in the ordinance were laid out—if the house lined up with the houses on the north and it did. I measured with a tape—and there was 5-foot clearance between the north side of the house and the adjacent property. I measured straight west from the southwest corner to the pavement and it was 39 feet plus a little fraction. I saw there was a lot of dirt piled up, which was temporary, and would be removed as the house progressed [all these matters were reported to Mr. Gilliland]; the building inspector has nothing to do with the 40-foot building line or district restrictions. At the time I inspected the improvement, the construction had reached about the stage it is now. I have seen it in the last two weeks. These exhibits [four photographs of defendant's basement] appear to be the basement of the Dr. Leiter house. They fairly represent the premises as they looked when I inspected them after Mr. Gilliland's complaint. I told Mr. Gilliland that I felt that the house was properly zoned to receive the best wishes of the neighborhood and surrounding property. In my opinion the house was in compliance with the Building Code and Ordinances of Sioux City and was not in violation of the City Zoning Ordinances. Mr. Gilliland said he didn't

like the appearance. He called in Mr. Call. I had a conversation with Mr. Call in Mr. Gilliland's office. Mr. Call objected to the location of the building and thought it would create a bottleneck, as he said. His principal complaint was the possibility of a bottleneck from the standpoint of traffic. I later received a letter from Mr. Call. I would say about ten days or two weeks later. I had several conversations with Mr. Call before he wrote me.

·"In placing houses on corner lots, the general practice is to try to make the needs of the builder meet the conditions of the lot. Corner lots are very difficult. Within the last few weeks, we have had many meetings where adjustments have had to be made by the Board of Adjustment so that normal houses can be placed on corner lots. They are difficult to zone. In the last few weeks the Board of Adjustment has made concessions to eight or ten people of 6½ feet to 8 feet. I consider that the house being constructed by Dr. Leiter on Lot 21 does not detract from the value of the surrounding property. I consider that any lot where there is no improvement is enhanced in value by building a very fine house such as Dr. Leiter is about to build here. I consider this particular house will increase the value of the surrounding property. I went to the head of the traffic department, Capt. Robinson, and had him inspect the property with me with regard to whether it constituted a traffic hazard or bottleneck."

The above-stated testimony of Mr. White was given as a witness for plaintiffs. Some of his testimony on cross-examination was objected to by plaintiffs.

Captain Robinson, a police officer of Sioux City for twenty-four years, in the traffic department for eighteen, serving in all positions including that of ranking officer, an attendant at the Northwestern University Traffic School in 1939, testified that he inspected conditions in the neighborhood, in company with, and at the request of, Mr. White, and that in his opinion the house shown in the four photographs, representing the situation in that location when he inspected it and built according to the plans, "will not constitute a traffic hazard of any kind." He was not cross-examined by plaintiffs.

The letter which Mr. Call wrote to Mr. White, with copy to

Mr. Earl C. Gilliland, and with copy by registered mail to defendant, bears date of April 29, 1950. It referred to the forty-foot building line, and expressed an opinion that the Leiter house violated it, and suggested that Dr. Leiter be informed of the restriction lest he run the hazard of litigation. The copy was received by the defendant on May 1, 1950.

On May 4, 1950, Mr. Call, as sole attorney for the plaintiffs, filed their petition in this case alleging the building restriction in the McHugh deed of plot 21, and the fact that defendant ignored Mr. Call's warning letter of April 29, 1950.

On May 9, 1950, by the attorneys appearing for them in this court, plaintiffs filed an amendment to their petition alleging that when the defendant filed his application for building permit he did not comply with the Building Code by reason of his failure to file a lot plan with his plans and specifications, and thereby unlawfully procured his building permit. The amendment also alleged that defendant's house will violate Par. 10 of Section 4A-4, which provides that there shall be a front yard of not less than twenty-five feet in depth, being the shortest distance between the building and any part of the street line.

On May 9 and 12, 1950, two petitions of intervention were filed by owners of plots, or parts thereof, in The Heights. The names of these intervenors and the location of their plots are as follows: P. D. Verstegen (9), J. H. Greenberg (7), Mrs. J. B. Merrill (20), Mrs. R. F. Warfield (Lot I in the Replat), H. R. Grueskin (21), R. B. Pecaut (11), Philip Schmelkin (43), C. V. Bowers (27), Arnold W. Metz (42), Dr. Arch L. O'Donoghue (25), C. S. Van Eaton (26), D. S. Rodin (33), Milton Mushkin (2), J. E. Dvorak (12), Pierce Knott (50), Haftor Sve (10), Lawrence Baron (49 and also vacant plot 32), H. M. Bailin (G in Replat), Benn D. Brodkey (31), T. R. Copeland (E in the Replat), George E. Becker (56), E. S. Gaynor Lumber Co. (57, 58), F. W. Cone (56 and vacant 55), Arthur S. Hardy (61), Marie P. Dales (K of Replat), H. C. Smith (30), W. P. Meyer (57), and Cecelia M. Valiquette (8).

The allegations in the petition of intervention are similar to those in the answer of defendant, but also assert libel of title and impairment of the value of intervenors' property. They pray for the dismissal of plaintiffs' petition and for damages.

Defendant's answer, in addition to denials, alleges that the building-line restriction and other restrictions in the deeds, urged against defendant, had been extinguished by reason of general and long-continued violations thereof and acquiescence therein by plaintiffs and other lot owners, and waiver and estoppel by them; that the building line as originally planned had been changed by division of many lots, replatting of others, laying out a new street, and is no longer practical or appropriate for the addition as now improved; that defendant expended a large sum of money in the excavation of the basement and constructing walls before any complaint was made by plaintiffs, who are estopped by their laches; that defendant had contracted to build a residence costing approximately $30,000, which will not detract from the general character and beauty of the neighborhood, but will be an improvement to it; that some of the plaintiffs have violated the building restrictions, and that it would be grossly inequitable to enforce the restrictions by injunctive process and would cause great damage to defendant without any comparable benefits to the plaintiffs or other lot owners in the addition.

Plaintiffs by reply to the answer and by answer to the petition of intervention denied their allegations.

As stated by the district court, the intervenors in their petitions asked no relief for themselves and offered no proof of damages to themselves, but by their testimony sought to sustain the issues contended for by the defendant, and it was these issues between plaintiffs and defendant that were decided by the court below. That court in its findings and decree passed upon no issues or contentions of plaintiffs and defendant except the ones pertaining to the building-line restriction in the McHugh deed, and shown in the recorded plat of the addition. In fact the court by its decree fixed the building line of the defendant's lot not forty feet from the lot line, as restricted in the deed of plot 21 and the recorded plat, but "40 feet distant from the *curb line* of the lot in question, the South part of plot 21." (Italics supplied.) The curb line is thirteen feet from and beyond the lot or plot line. In platting the addition the streets were laid out fifty feet wide, but, as testified by the surveyor, Mr. Finley, witness for plaintiffs, only the center twenty-four feet of the

156.0'

N

Scale 1" = 40'

Plot 21

132.33'

132.33'

150'

37.6'

4.7

28.5'

20.2'

130'

110.67'

Building
Restriction
Line

Lot
Line

400'

inside of gutter

street were paved and guttered or curbed, leaving thirteen feet on each side of the paving between the gutter or curb and the lot lines. This also appears from Exhibit C, a plat of plot 21 made by Mr. Finley, a duplicate of which, drawn to the same scale, we set out herein. The plaintiffs in their argument have found no fault with any part of the decree and have not appealed.

The size of the plots as originally platted indicates the intention to have expansive grounds about the home. That plan has been carried out on several of the plots. Several plots have been divided and sold, and four plots were replatted into eleven lots, no doubt with permission of The Heights Association, as required in the deeds. Reduction in the size of these lots coupled with pronounced curved lot lines made compliance with the forty-foot restriction more difficult in a number of instances, the defendant's lot being such a one.

It is our conclusion that the deed does not restrict the number of residences on a plot to one. There also has been some difference of opinion whether the forty-foot distance should be measured from a porch, or from the main part of the house. The deed gives no information on the matter and there is no evidence of the intention of those establishing the addition. The Revised 1947 Zoning Ordinance provides that in determining the size of a front yard the measurement shall be from a porch unless it is uncovered. Numerous photographs of homes in the addition were received as exhibits and they have been certified to us. Few of the porches are uncovered. The chief purpose of building-line restrictions is to prevent interference with the view of the residents. There are many large trees on the lots and the parking, and more of the lots are landscaped and have shrubbery, hedges and evergreen trees. These and the curving streets quite effectually interfere with the view along the streets without regard to the porches. The measurements taken by plaintiffs were from the main building, the defendant measured from the porches in some instances.

The evidence clearly establishes that the building-line restriction of the deed has been violated many times by placing buildings nearer the street lot lines than forty feet. In several instances the violation has been of little consequence—a foot or less—but in others the distance has been more substantial. The

defendant offered evidence that thirty-three residences were located less than forty feet from the lot line. The plaintiffs have disputed the accuracy of but few of the distances. We are not considering those disputed. Three of the infractions are less than a foot, three are just a foot. We note the following distances in feet from the lot lines: 37 (Bessie Wilson, one of the plaintiffs), 36.8, 36.7, 36.5, 36.3 (Lulu C. Gilliland, plaintiff), 36.2, 35.5, 34.2, 33, 32.2, 27, 24.4, 22.3, 17.6. In the following the first figure is the measurement from the porch and the figure in parentheses is the width of the porch: 30 (10), 31 (9), 32.7 (13′ 3″), 34.1 (6′ 4″), 34.3 (6), 35.2 (4′ 10″), 35.3 (10′ 2″), 37 (3′ 4″), 37.6 (8′ 2″).

Where the distance under forty feet is less than a foot it might well have been an inadvertence, and that is possible where it was a foot. But the other distances can hardly be charged to carelessness, they indicate intention and a very general indifference to and disregard of the forty-foot deed restriction. Other lot owners probably did not know of some of these distances. No one ever protested, but each owner very likely knew how far his building was from his lot line, and also knew that such shortages were being acquiesced in generally by owners in the addition.

W. P. Meyer owned all or a part of plot 57, which has a curved lot line very like that of defendant. He had some difficulty in staking out his house and he consulted Attorney Hatfield, who told him to talk to his neighbors about it. He asked only Mr. Gaynor, who owned a residence in the adjoining plot. He had no objection. Mr. Meyer built a house that was distant from his lot line on Kennedy Drive 17.6 feet at the northeast corner and 19.2 feet at the southeast corner.

Arnold Metz in 1950 was building a house in plot 42 which was but 33 feet from the plot line on McDonald Drive. In the adjoining plot 43, to the north, Philip Schmelkin or Mr. Finke built a residence only 24.4 feet, and a garage but 29 feet, from the plot line on McDonald Drive. No one protested to these builders, not even George R. Call, who is a plaintiff and an attorney for plaintiffs and was also a witness for them. His home is just across the street from both of these properties. Mr. Call testified that he was "familiar with the Arnold Metz house

which is now being built directly across the street from my home. * * * I have never made any protest to Mr. Metz. I am familiar with the house of Mr. Philip Schmelkin on Lot 43. * * * I have a personal objection to that house but I have never made any objection to the owner or to the building inspector about it. These two houses, the Metz house and the Schmelkin house, are the closest to my property across the street." Mr. Keightly, the only lot owner in the addition other than seven plaintiffs—one, Mr. Hoffman was not a witness—who testified against defendant, testified: "I have never made objection to any of the violations of the 40-foot building line. I did talk to one or two people about the Kenny Finke house. I made no objections to Mr. Finke but just wondered why something wasn't done." No one did do anything and there is no evidence that anyone else wondered. Marvin Klass, representing plaintiffs in this appeal to this court, in 1950 was building a residence just across West Solway from Mr. Keightly's home, which was but 34.2 feet from the lot line. No doubt when he examined the abstract of title to his lot he discovered the building-line restriction. If he violated it intentionally it was probably because he knew of its general nonobservance.

The residences of four of the eight plaintiffs are less than 40 feet from the street lot line. The nearest corner of the Gilliland house was 36.3 feet from the east lot line. The curve in that line was not nearly so pronounced as in the curved lot line of defendant's lot across the street. The Gilliland property is 194 feet long on its north line and 188 feet long on its south line, and the width is 138 feet, which shows a variation in the curve of 8 feet in that width. The variation in the curves on the defendant's lot was 17 feet in a width of 28.5 feet, as shown on Exhibit C, but which the plans of the house show was 26.6 feet.

The twenty-eight intervenors alleged in their petitions that the forty-foot-building-line restriction had been abandoned or waived by its general nonobservance for a long time. Ten of them and two other lot owners testified for defendant. Mr. Grueskin was one of them. His property adjoins defendant's on the north. Mr. Van Eaton's home adjoins that of Mr. Grueskin and Mrs. Merrill lives just north of the Van Eaton property. Directly across the street from the Grueskin and Van Eaton

homes are those of Dr. O'Donoghue and Mrs. Watkin and cornering with the northwest corner of the O'Donoghue lot is the home of David L. Rodin. Adjoining the latter's home on the east on East Solway is the C. V. Bowers property. North of the Rodin home and adjoining it is a vacant plot belonging to Lawrence Baron, on which abuts the home of Benn Brodkey. West of the Rodin home just across West Solway are two plots owned by F. W. Cone, one is vacant and he lives on the other. Abutting defendant's lot on the east is the home of J. H. Greenberg. Just north of it in order and without intervening lots are the homes of Cecelia M. Valiquette, P. D. Verstegen, Haftor Sve, Russell B. Pecaut and J. E. Dvorak. Directly south across 24th Street from defendant's lot are the homes of George W. Lee and V. P. Dales. The home of Milton Mushkin is a little west of these on 24th Street, and adjoining the Lee property on the south is the home of Mrs. R. F. Warfield. In the same neighborhood fronting northerly on Kennedy Drive, a new street made in replatting plots 3, 4, 5 and 6, are the homes of T. R. Copeland and Harry M. Bailin. The other intervenors live in all parts of the addition: W. P. Meyer is in the extreme south; the Gaynor property, in two plots, is just north; the Hardy property is in the third plot northwesterly from the Gaynor home; in the extreme north-central part of the addition in the same neighborhood are the homes of Philip Schmelkin, Lawrence Baron, Pierce Knott, Arnold Metz and Howard C. Smith. These intervenors and witnesses for defendant own half or more of the property in the addition. They include the majority of the home owners living in the vicinity of defendant's lot and most affected by and interested in the location of his home on that lot.

But eight owners of property in the addition—seven plaintiffs and one not—testified for plaintiffs. The pertinent part of the testimony of each is, substantially verbatim, that, in his opinion, "the completion of the Leiter house would materially reduce the beauty and value of property in The Heights Addition." Let us consider this opinion in the light of the evidence. Defendant bought this lot in 1946 and immediately made plans to build on it. For years before it had been a weed patch and a dumping ground for the neighbors' trash and refuse. It was a hazard from brush fires and an eyesore and an ugly spot in a beautiful addi-

tion and among fine homes. It was so much so that Dr. O'Donoghue testified he once contemplated renting the lot for a garden so that it could be kept clean. To say that construction of the $30,000 home as planned and the landscaping of the grounds, also as planned, will detract from the beauty or value of any or all of the property in the addition is contrary to common sense and common knowledge, and borders on fantasy.

Mrs. Dean Tyler Merrill, a widow, testified:

"When we built the house 26 years ago, it was the first house on that side of the street [East Solway]. My house is 300 to 350 feet from the Leiter house. There are two houses between. The Leiter property was an unsightly piece of ground before the building started. It was more or less used as a dump ground by the neighbors. I have no objection to Dr. Leiter building his house in its present position. I think the completion of the house will be a substantial improvement in the beauty and the value of property in The Heights generally, and of my own property. I pass this property on my way to town."

The witnesses, Mrs. Dales, Mr. Rodin, Mr. Pecaut, Mr. Copeland, Dr. O'Donoghue, Mr. Grueskin, Mr. Johannsen, Mr. Clark Watkin, Mr. Lee, Senator Van Eaton, Mr. Verstegen, Mr. White, City Building Inspector, and Mr. W. L. Sloan, in the real estate and loan business and president and manager of the First Federal Savings & Loan Association of Sioux City, each testified in full agreement with the opinion expressed by Mrs. Merrill, .supra.

All other owners of property in The Heights, not mentioned in this opinion, took no part in the litigation, so far as the record shows. From this nonparticipation it may be fairly assumed that they were not interested in the location of the residence on defendant's lot.

The trial court did not pass upon the allegations in the petition that defendant violated provisions in the Building Code and Zoning Ordinances, but we find they were not established.

The allegation that the building permit was illegally issued because no plans or specifications for the house were filed in the office of the building inspector is without merit, in view of Mr. White's testimony. He stated the permit recites on its face that

after the trenches are excavated, forms are erected, and foundation material is on the ground, the permit holder shall notify the "Building Inspector, Telephone 8-0169, 36 hours in advance for approval," before any building is started. He also testified: "There was no 'Copy of Plans' filed to in [sic] Sec. 84.6 of the Building Code. That has been substituted for by this other process. There has been no change of the Ordinance or Regulations that I know of, but it don't work so we have it this way, which does work."

We have already noted the building inspector's testimony of the frequent difficulty in complying with Building Code and Zoning regulations in building on corner lots, particularly one like the defendant's where a decidedly curved line comprises two adjacent sides of the lot. He spoke of the necessity of often being compelled to make material modifications and adjustments respecting building lines and front-yard areas. He was familiar with this lot. He had been consulted by architect Swanson when the first building plan was made, and staked on the ground. He was consulted by Mr. McEntaffer and was given the plans when the present house was staked. In each case he approved what was done. Necessarily he is vested with judgment and discretion in meeting specific conditions. He insisted that the house be in line with those to the north—the Grueskin, Van Eaton, Merrill et al. houses, and it did conform. He rightly determined that the front-yard area was sufficient and complied with the Building and Zoning Codes. The Revised 1947 Zoning Ordinance of Sioux City, which by its title is to "regulate and restrict the location and use of buildings * * * and to regulate and determine the area of yards", provides the front yard is the lot area in front of the building, the depth of which is the minimum horizontal distance not less than 25 feet, between the street lot line and the front of the building. The northwest corner of the front of defendant's house, the center of the front, and the southwest corner of the front, are, respectively, 37.6 feet, 30 feet and 25 feet from the street lot line.

There were other conditions in this case which complicated matters and required consideration. Mr. Finley made a contour map of the lot showing elevations. The north line was approximately 150 feet long. At the northwest corner of the lot the

elevation was 101.8. East of the house on this line the elevation was 114.8. At the northeast corner the elevation was 127.0, and south on the east line the elevations were 125.0, east of the house, 120.0, 115.9, 110.0, and 105.8 at the southeast corner of the lot. The curved side was of an approximate elevation of 100.0 throughout. Each line south of and parallel with the north lot line diminished in length until the most southerly had no length. There was a like diminution in length with any lines parallel with the east lot line. It was a practical necessity that the house face west and be as near to the north line as possible. The house is 52 feet long, 38 feet wide at the rear, and 26.6 feet wide at the west side. The high ground at the back of the lot, reaching an elevation 25 feet higher than that at the front lot line, required the house to be placed as far west as possible.

These conditions no doubt influenced the decision of the building inspector in approving the proposed location of the house, and we assume that they induced the trial court to place the building line of this lot forty feet back from the curb line instead of forty feet back from the lot line or street line as required in the deed. It will be observed in the duplicate of Mr. Finley's plat of defendant's lot shown herein that the area between the upper dotted line, which is the forty-foot building line, and the curved lot line is more than half of the area of the lot; this left for building purposes the lesser portion in a right-angled triangle reduced in area and on a steep grade, with a curving hypotenuse. With the plot undivided as originally laid out there was no difficulty in complying with the building-line restriction, as the location of the Grueskin house indicates. But the division of the plot greatly changed conditions in the Leiter lot. Under similar circumstances affecting the lots of Mr. Cone, Mr. Meyer, Mr. Baron, Mr. Metz, and Mr. Finke the forty-foot building line was substantially disregarded.

Our complete review of the record, including eighty or more plats, plans and photographs convinces us that there has been a widespread, substantial, and long-continued nonobservance of this restriction, without protest from property owners.

The equities in this case strongly predominate in favor of the defendant. From the inception of his building plans he sought to comply with city requirements. He had the advice, direction

and approval of the building inspector in what he did. Considerable work had been done in sight of plaintiffs before complaint was made to him. He had constructive knowledge of the recorded plat of the addition, but he testified he had no actual knowledge of the forty-foot restriction. Plaintiff Gilliland lives across the street, but that home is south of the Leiter house, and the view from it or of it either along West 24th Street or East Solway will not be interfered with by defendant's house. This is true beyond all controversy as to other plaintiffs. The evidence is overwhelming that defendant's improved lot will add to the beauty of the addition and the value of property therein and will in no way injure the property of any plaintiff. The balance as between the disadvantages, if any, and the benefits from constructing defendant's home is in favor of the latter. Able arguments on propositions of law have been presented to us by each side, but the facts are controlling in the decision of this case.

On the plat of defendant's lot, herein set out, we have drawn to the scale of the plat—1″ equals 40′—a curved broken line, the lower one of the two curved broken lines. It represents the building line for this lot as fixed by the trial court, and is forty feet from the curb line of the lot and the street. It will be observed that the entire house will be back of this line except the small triangular portion at its southwest corner. For the construction done, the defendant testified the expense has been $4500, of which he had paid $2500. The rise in the expense of labor and materials since the injunction will add greatly to the original estimate of the construction costs of the building. To compel defendant to move the constructed work entirely back of the new building line would cost him a very substantial amount of money, and will benefit no one. This would be neither justice nor equity.

It is our conclusion that the decree of the district court be modified by striking therefrom that part of it stating that the defendant "is hereby permanently enjoined and restrained from maintaining or erecting any building * * * less than 40 feet distant from the curb line of the lot in question, to wit, the South part of Plot 21, The Heights, an Addition to Sioux City, Woodbury County, Iowa." By the word "building", just above, we mean the building used as the residence or home. The costs

of the action both in the district court and in this court shall be taxed one half to defendant and one half to the plaintiffs. In other respects the decree is affirmed, and the case is remanded to the district court for entry of decree in conformity with this opinion.—Modified and affirmed.

WENNERSTRUM, C. J., and GARFIELD, SMITH and THOMPSON, JJ., concur.

MULRONEY and HAYS, JJ., concur in the result.

OLIVER, J., takes no part.

MANTZ, J., not sitting.